## COHEN v. NEW YORK LIFE INS. CO.

Circuit Court of Appeals, Third Circuit.
August 9, 1927.

No. 3509.

1. Evidence ⬤=181—Secondary evidence of note is not admissible until note is shown to be competent.

Before secondary evidence of the contents of a note is admissible, it must be shown that the note itself would be competent.

2. Evidence ⬤=182—Evidence of contents of lost note held inadmissible, where it was shown that the note was not signed and the handwriting was not identified.

In an action on a life policy, in which the defense was that insured committed suicide, admission of secondary evidence of the contents of a note found in his pocket after death, and which had been lost, held error, where it was shown that the note was not signed and the handwriting was not identified as his.

3. Trial ⬤=120(3)—Finding of suicide by coroner's jury in suit on like policy, being incompetent, should not be impliedly stated by counsel in presence of jury.

In an action on a life policy, the finding of a coroner's jury that insured committed suicide, not being admissible in evidence, should not, expressly or impliedly, be brought to the attention of the jury, by counsel.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

At Law. Action by Regina Cohen against the New York Life Insurance Company. Judgment for defendant, and plaintiff brings error. Reversed, and new trial granted.

David S. Malis, of Philadelphia, Pa., for plaintiff in error.

Arthur G. Dickson, of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This was an action by Regina Cohen to recover double in-

demnity on a life insurance policy issued to her husband, Joseph J. Cohen, for $10,000 by the New York Life Insurance Company. The policy provided that the company would pay "double the face of this policy upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent, and accidental cause." But it was further provided that "this double indemnity benefit will not apply if the insured's death resulted from self-destruction, whether sane or insane." The limit of liability of the company, in case of suicide, was the amount of premiums paid.

The policy was executed on April 12, 1922. It was admitted that the insured "came to his death by a gunshot wound in the head on October 30, 1923," 18½ months after the execution of the policy. The deceased resided in Philadelphia, Pa., but at the time of his death he was temporarily stopping at the home of Abraham Stern, at 219 Atlantic avenue, Atlantic City, N. J. His body was found at about half past 7 o'clock in the morning, in the back yard, with a revolver containing one exploded cartridge shell lying a few feet away from him.

The plaintiff sued the company for double indemnity of $20,000. The company admitted liability for the premiums only, and actually tendered these on March 10, 1924. This offer was refused. Suit was brought, and the case was tried to the court and jury, which rendered a verdict for the plaintiff of $950.61, which was the amount of the premiums. The verdict was based upon a conclusion of fact that the insured killed himself and was not killed by another, or, in other words, his death did not result "directly and independently of all other causes from bodily injury effected solely through external, violent, and accidental cause." There was evidence to sustain the verdict, and the judgment based thereon should stand, unless prejudicial error was committed at the trial.

The judgment is here for review on plaintiff's writ of error. She contends that the judgment should be reversed because of two errors: (1) The admission in evidence of the contents of a note supposed to have been written by the deceased; and (2) the refusal to withdraw a juror and continue the case because of prejudicial statements made in the presence of the jury when seeking the admission of evidence.

The note in question was found in the house in the inside pocket of the deceased's coat, which was in his room. The following testimony was admitted over objection regarding the note. Roselle T. Allmand twice stated its contents as follows:

"He (Cohen) says, 'Forgive me for what I am about to do. I cannot go on like this forever, always'—I ain't sure which. 'Give my body to Joseph L. Roth for a Jewish funeral. Have my children say Kaddish for me. You know where my papers can be found. I leave everything to you and the children.' Then was the uncompleted signature, an unfinished J at the bottom of it. That is as near as I can say after all this time."

He repeated it later as follows:

"'Dear Ray: Pardon me for what I am about to do. I cannot go on like this forever. Give my body to Joseph L. Roth for a Jewish funeral. You know where my papers can be found. I leave everything to you and the children.' Then was the uncompleted signature. That is as near as I can remember it. That has been two years."

Dr. Souder, the coroner, made three references to the note:

"This letter was an appeal to the wife, asking forgiveness for what he was about to do. That is the substance of it." "There was some reference made to the children, and I think something about the burial." "I have a recollection of the signature 'Joe.'"

Malvina Gluckman said:

"The letter was addressed to 'Dear Ray: I cannot go on with this life any longer. I want forgiveness for what I am doing. Have my body turned over to Joseph L. Roth. Have my sons say Kaddish.' That is all I can remember. The note was signed with a J, unfinished."

She further said that she could not recollect the entire note nor even the substance of it.

The note was not produced in evidence, and nobody knows where it is. It was last seen in a pigeonhole in a desk at the undertaker's establishment. The handwriting on the note was not identified, and so no one knows who wrote it, nor when it was written, nor its exact contents.

[1, 2] At the trial, the learned District Judge refused to admit the contents of the note under the rule of res gestæ, but, since the note had been seen and could not then be produced, he admitted its contents under the rule of secondary evidence. But, before it could be admitted under that rule, it was necessary to show that the note itself was admissible if it could be produced. In the present state of the record, the note could not be admitted because no one knows who wrote it. On a rule to show cause why a new trial should

not be granted, the court said the note was admissible under the rule of res gestæ. The admission of evidence under this rule is an exception to the hearsay rule. Hearsay evidence is generally inadmissible, but, under circumstances of great nervous shock, of high excitement, the reflective faculties may be sealed and their control removed so that an utterance made under those circumstances is spontaneous and a true response to the sensations already produced by the external shock. Statements thus made are presumed to be as veritable as the fact itself in connection with which they are spoken. They would derive no enhancement of their credibilitv from the oath of the declarant. A declaration made under such circumstances is so connected with the transaction itself as to become a part of it, and is not the declarant's account of the transaction. Section 747, Wigmore on Evidence; Mitchum v. State, 11 Ga. 621; Hanover Railroad Company v. Coyle, 55 Pa. 396, 402; Keefer v. Pacific Mut. Life Ins. Co., 201 Pa. 448, 456, 51 A. 366, 88 Am. St. Rep. 822; Missouri State Life Ins. Co. v. Makiver (C. C. A.) 4 F.(2d) 185. It is therefore necessary to know who speaks and the circumstances under which he speaks in order to determine the admissibility of evidence under the rule of res gestæ. Neither is known in this case. Disregard of this rule would result in great and irreparable injustice to defendants. It was accordingly prejudicial error to admit testimony as to the contents of the note, just as it would have been to admit the note itself, without identifying the handwriting as that of the deceased and the circumstances under which it was written.

[3] The second ground urged for reversal is the remark made by counsel for the defendant in the presence of the jury that the coroner's certificate contained the statement that the deceased committed suicide. The court refused to admit the certificate. Counsel did not expressly say that the certificate contained that statement, but, in arguing its admissibility, he substantially stated that fact, so that the jury must have known it. It was the function of the jury, uninfluenced by the verdict of the coroner's jury, to find from legal evidence how the deceased came to his death. The conclusion of the coroner's court, embodied in the certificate, had no place in this case, and should not on a retrial expressly or impliedly be brought to the knowledge of the jury. Wagner v. Hagle Township, 215 Pa. 219, 64 A. 405.

It follows that the judgment must be reversed and a new trial granted.